UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DEON COLEMAN,

Plaintiff,

Civil Action No. 12-10099

v.

Hon. Mark A. Goldsmith
Mag. Judge Laurie J. Michelson

M. GULLET, *et al.*,

Defendants.

_____________________________________/

**REPORT AND RECOMMENDATION TO GRANT DEFENDANTS CORIZON HEALTH, INC., REEVES, COLEMAN, KILARU, MORRIS, AND COUTURIER'S MOTION TO DISMISS OR FOR SUMMARY JUDGMENT [77]**

Plaintiff Deon Coleman began his incarceration with a bullet lodged in his hand and a broken right ankle set in a cast. Plaintiff claims that the medical treatment provided by the Oakland County Sheriff's Office and three Michigan Department of Corrections ("MDOC") facilities was so deficient that it violated the Eighth Amendment's proscription on "cruel and unusual punishments." He says that his cast was not removed for six months resulting in difficulty showering, a foul odor, and water-logged skin. He maintains that his right-ankle still contains a broken surgical pin, remains unhealed, and continues to cause him great pain.

Plaintiff sued 20 Defendants; seven have been dismissed. The Court dismissed the State of Michigan on sovereign immunity grounds. (Dkt. 7, Op. and Order Dismissing State of Mich. at 3.) The Court dismissed Defendants Heather Bailey, David Bergh, Judy Crisenbery, Lori Gidley, and Felipe Perea because Plaintiff failed to administratively exhaust his claims against them prior to filing this suit. *Coleman v. Gullet* ("*Coleman Op. & Order*"), No. 12-10099, 2012 WL 5986679, at *2 (E.D. Mich. Nov. 29, 2012) (Goldsmith, J.); *see also Coleman v. Gullet* ("*Coleman R & R*"),

No. 12-10099, 2012 WL 5986779, at *3-9 (E.D. Mich. Sept. 4, 2012) (Michelson, M.J.) *report and recommendation adopted by*, 2012 WL 5986679 (E.D. Mich. Nov. 29, 2012). The Court dismissed Defendant Dorene Smith pursuant to 28 U.S.C. § 1915(e) because Plaintiff's Complaint, even when supplemented with assertions made in his response to Smith's dispositive motion, failed to state a claim upon which relief may be granted. *Coleman Op. & Order*, 2012 WL 5986679, at *2; *see also Coleman R & R*, 2012 WL 5986779, at *9-14.

Now before this Court for a report and recommendation is a motion to dismiss or for summary judgment filed by six of the remaining Defendants: Corizon Health, Inc., Dr. Rickey Coleman, Dr. Ramesh Kilaru, Dr. Lisa Reeves, Physician Assistant Gina Couturier, and Physician Assistant Foster Morris (collectively, "Corizon Defendants"). (Dkt. 77.) Plaintiff has responded to the Corizon Defendants' motion.[1] For the reasons set forth below, this Court RECOMMENDS that their motion be granted and that Defendants Corizon Health, Inc., Coleman, Kilaru, Reeves, Couturier, and Morris be DISMISSED WITHOUT PREJUDICE.

---

[1]Plaintiff has filed his responses to the Corizon Defendants' motion in piecemeal fashion. The following is a list of the responses reviewed by the Court:

- "Plaintiff['s] Response for Motion to Dismiss or Alternative Summary Judgment." (Dkt. 89.)
- "Responding to Corizon Health Inc., Dr. Lisa Reeves, PA Morris, Dr. Kilaru Motion to Dismiss or Alternative, Motion for Summary Judgment." (Dkt. 93.)
- "Plaintiff's Response to PA Morris['] Motion to Dismiss or Alternative Summary Judgment." (Dkt. 93 at Pg ID 974.)
- "Response to Motion to Dismiss and Summary Judgment Dr. Kilaru." (Dkt. 94 at Pg ID 1039.)
- "Response to Corizon's Motion to Dismiss or Summary Judgment." (Dkt. 94 at Pg ID 1004.)

Throughout this Report and Recommendation, the Court will refer to Plaintiff's responses by docket number.

## I. BACKGROUND

### A. Plaintiff's Allegations Against The Corizon Defendants

While detained in the Oakland County Jail pending sentencing, Plaintiff was allowed to see an orthopedic specialist, a "Dr. Lambert." (Compl. at Pg ID 12.) Dr. Lambert noted that Plaintiff's ankle was badly damaged and re-casted the ankle. (*Id.*) He also prescribed Ultram. (Compl. at Pg ID 12, 15; Dkt. 93 at Pg ID 974.)

In June 2011, Plaintiff was sentenced and taken into custody by the Michigan Department of Corrections. Plaintiff arrived at the Charles Egeler Reception and Guidance Center ("RGC") on July 8, 2011. (Compl. at Pg ID 12.) Only one of the presently moving Defendants worked at RGC while Plaintiff was there: Physician Assistant Foster Morris. (*See* Compl. at Pg ID 7.) It appears that Plaintiff first saw Morris on July 11, 2011; Morris discontinued Plaintiff's prescription for Ultram and instead prescribed Naprosyn. (*See* Compl. at Pg ID 12; Dkt. 93 at Pg ID 974, 980.)

On July 14, 2011, Plaintiff went to the emergency room at the Duane Waters Health Center (an MDOC hospital). (Compl. at Pg ID 12; Dkt. 93 at Pg ID 980.) An x-ray revealed that Plaintiff's ankle was not completely healed and that a surgical screw inside his ankle was broken. (Dkt. 93 at Pg ID 981.) Plaintiff asserts that, based on this x-ray, Morris was "aware of the need [for] a specialist." (*Id.* at Pg ID 974.) Plaintiff also asserts, "Morris admit[ted] surgery [was] necessary but refuse[d] to schedule it." (*Id.*) Plaintiff adds that, by this time, he had been wearing his cast for about three months. (*Id.*)

Although the Step I grievance forms do not appear in the record before the Court, it appears that sometime in mid- or late-July 2011 Plaintiff grieved certain healthcare professionals at RGC. (*See* Compl. at Pg ID 14, 15.) Plaintiff maintains that, in response to these grievances, Morris and

Dorene Smith retaliated against him by "forg[ing]" a medical-treatment liability release. (Compl. at Pg ID 12; Dkt. 93 at Pg ID 974-75.) More specifically, Plaintiff says that, on July 28, 2011, Smith told Plaintiff that he should see Morris and "things will be different." (Compl. at Pg ID 12; Dkt. 93 at Pg ID 974.) When Plaintiff arrived at his appointment, Morris allegedly said, "here sign this" (referring to the release). (Dkt. 93 at Pg ID 974.) Plaintiff refused. (*Id.*) When Plaintiff received a copy of the release a few days later, it stated that he had released Morris and RGC from responsibility for his decision to decline the medical treatment Morris had recommended. (Compl. at Pg ID 16); *see also Coleman R & R*, 2012 WL 5986779, at *10-11 (providing detailed description of the release). In a section of the form that prompted, "[r]eason for refusal and/or other remarks," Smith quoted Plaintiff as stating, "Because I don't wanna." (Compl. at Pg ID 16.) Plaintiff says that Smith and Morris' forgery was an adverse action that chilled the exercise of his First Amendment right to file grievances. (Dkt. 93 at Pg ID 975.) He also says that "Morris knew [that] this forged document would cause an unending delay to a specialist as the next providers will view the document as a[n] excuse not to provide treatment." (*Id.*)

Plaintiff was transferred from RGC to MDOC's Mound Correctional Facility ("NRF") on or around August 18, 2011. (*See* Compl. at Pg ID 7, 25.) Among the presently moving Defendants, Dr. Lisa Reeves and Dr. Ramesh Kilaru worked at NRF during Plaintiff's stay there. (*See* Compl. at ECF Pg ID 7.) Plaintiff saw Reeves on September 15, 2011. (Compl. at Pg ID 21; Dkt. 89 at Pg ID 859.) He claims that Tegretol is not a pain killer, yet Reeves "increased [the dosage of] the destructive medication." (Dkt. 89 at Pg ID 859.) Reeves also allegedly said that Plaintiff did not meet the criteria for a specialist. (*Id.*) Reeves purportedly acknowledged that Plaintiff had been wearing a cast for four months, but failed to remove it; Plaintiff says that the cast then smelled like

a "dead animal." (*Id.*) On September 15, 2011, Plaintiff filed two grievances against "Dr. Reeves," "others," "healthcare," and Reeves' "medical provider." (Compl. at Pg ID 24, 26.)

The next day, September 16, 2011, another medical provider, Dr. Harriet Squire, provided, "Remove cast on site and obtain x[-]rays. If bones [are] healed, manage on site. If poor healing, consider referral at that time." (Dkt. 89 at Pg ID 880.)

Sometime around October 10, 2011, Plaintiff saw Dr. Kilaru. (Dkt. 89 at Pg ID 860.) Plaintiff alleges that Kilaru insinuated a sexual favor by stating he could make Plaintiff feel better. (Dkt. 89 at Pg ID 861.) Plaintiff states that Dr. Kilaru scheduled Plaintiff to have his cast removed on October 31, 2011, but provided no other treatment. (Dkt. 89 at Pg ID 860.) Dr. Kilaru also allegedly told Plaintiff that "you'll never get that [ankle] fixed, it's ok to stop babying it." (*Id.*)

Plaintiff was transferred from NRF to Thumb Correctional Facility ("TCF") on or around November 9, 2011. (*See* Compl. at Pg ID 7; Dkt. 89 at 860.) It appears that, among the moving Defendants, Kilaru, Dr. Rickey Coleman, and Physician Assistant Gina Couturier worked at TCF during the relevant time period. (*See* Compl. at Pg ID 7.) Apparently Kilaru transferred to TCF from NRF; Plaintiff says that Kilaru treated Plaintiff with a "hostile, aggressive, unprofessional" attitude and that Plaintiff would not visit the doctor alone out of fear that Kilaru would set him up. (Dkt. 89 at Pg ID 860.)

A grievance attached to Plaintiff's Complaint states that Plaintiff saw Couturier on December 1, 2011, but she was unable to provide Plaintiff pain medication or an orthopedic visit without a doctor's consent. (Compl. at ECF Pg ID 49.) Plaintiff grieved that "the doctor who PA Schuitman and PA Couturier report to should not put finance[s] before health. This is horrific, and medical madness to deny me Ultram." (*Id.*) Plaintiff also states that, at some point, Couturier prescribed him

Motrin despite knowing that Plaintiff was allergic to that medication. (Dkt. 89 at 862.) He further claims that Couturier told him to do physical therapy without providing any instruction. (Dkt. 89 at 862.)

Plaintiff accuses Dr. Coleman (along with all the other TCF Defendants) of refusing to provide access to outside medical care even after reviewing Plaintiff's x-rays. (Compl. at Pg ID 7.) Dr. Coleman also allegedly told Plaintiff to walk on his damaged ankle. (*Id.*)

**B. Plaintiff's Grievances**

On September 4, 2012, upon a review of the record then before the Court, this Court identified eight grievances that Plaintiff filed before filing this suit. *See Coleman R & R*, 2012 WL 5986779, at *3-13. This Court then concluded that the then-moving Defendants had carried their summary judgment burden of showing that only two of the eight grievances, NRF-2011-09-0725-28B ("NRF 0725") and NRF-2011-09-0726-28B ("NRF 0726"), had been exhausted. *Id.* at *7-9. This Court also pointed out a potential disputed question of material fact regarding a third grievance: whether Perea's conduct or Plaintiff's transfer from RGC to NRF excused his failure to timely exhaust the RGC-2011-08-1158-12D ("RGC 1158") grievance. *Id.* at *9.

In objecting to this Court's September 4, 2012 report and recommendation, Plaintiff did not argue that he had exhausted the other five grievances. (*See generally*, Dkt. 57, Pl.'s Objs. to Sept. 4, 2012 Report and Recommendation.) Nor did he argue that there were exhausted grievances that this Court failed to consider. (*See generally id.*) In fact, in adopting the report and recommendation, District Judge Mark A. Goldsmith noted that "Plaintiff objects only to the Magistrate Judge's recommendation to dismiss Defendant Smith. As to the other recommendations made by the Magistrate Judge regarding Defendants Bailey, Bergh, Crisenbery, Gidley, and Perea, Plaintiff does

not object." *Coleman Op. and Order*, 2012 WL 5986679, at *1.

The presently moving Defendants also seek dismissal on exhaustion grounds. (Dkt. 77, Corizon Defs.' Mot. Summ. J. at 9-14.) The Court has reviewed Plaintiff's responses to the Corizon Defendants' summary judgment motion (*see* Dkts. 89, 93, 94), and has not identified any additional grievances filed (let alone exhausted) before Plaintiff filed this suit.[2] In fact, in responding to the Corizon Defendants' claims of non-exhaustion, Plaintiff merely relies on the NRF 0725 and NRF 0726 grievances and the RGC 1158 grievance. (Dkt. 89 at 1; Dkt. 93 at 2.) Accordingly, the Court summarizes Plaintiff's efforts to exhaust these three grievances.

Plaintiff completed the RGC 1158 grievance on August 2, 2011. (*See* Compl. at Pg ID 19.) It states in relevant part:

> This grievance is against MDOC RGC health care and P.A. Morris. I have proof he committed a crime of forgery. He signed my name on [July 28, 2011]. To release responsibility of the MDOC. This is a First Amendment claim of retaliation! . . . This is a violation of my ADA rights under Title II Act. . . . I'm suing you P.A. Morris in you personal and professional capacity . . . .

(*Id.*) The RGC grievance coordinator received the grievance on August 8, 2011; a receipt informed Plaintiff that a response would be forthcoming by August 29, 2011, and, if he had not received a response by that date, he could request an appeal form from "this office," i.e., the RGC grievance coordinator's office. (Dkt. 93 at Pg ID 991.) On August 18, 2011, however, Plaintiff was transferred to NRF. On or around August 20, 2011, Plaintiff requested a Step II grievance form for the RGC 1158 grievance from Perea, the grievance coordinator at NRF. (Dkt. 33, Pl.'s Resp. to

[2]Plaintiff has now produced Step II grievance responses from the Macomb Correctional Facility, but they relate to conduct that occurred well after the filing of this lawsuit. (*See* Dkt. 93 at Pg ID 995-96.) They are therefore not relevant to whether Plaintiff has administratively exhausted the claims presented in this case.

Perea's Mot. Summ. J. at 1.) It appears that on or around August 23, 2011, Perea responded that Plaintiff needed to, pursuant to an MDOC policy, request a Step II grievance form from the grievance coordinator at his prior facility, RGC. (*See* Dkt. 33, Pl.'s Resp. to Perea's Mot. Summ. J. at 1; Dkt. 35, Pl.'s Resp. to Smith's Mot. Summ. J. at Pg ID 354.) Plaintiff apparently made that request on August 24, 2011, but did not receive the appeal form from RGC until September 13, 2011. (*See* Dkt. 33, Pl.'s Resp. to Perea's Mot. Summ. J. at Pg ID 330.) This was problematic because, by then, the September 7, 2011 deadline for filing a Step II grievance had passed. (*See* Dkt. 35, Pl.'s Resp. to Smith's Mot. Summ. J. at Pg ID 355.) Indeed, on October 4, 2011, the grievance coordinator at RGC rejected Plaintiff's Step II appeal of the RGC 1158 grievance as untimely. (*Id*.)

Plaintiff completed the NRF 0725 grievance on September 15, 2011. (Compl. at Pg ID 24.) It states, in part, that Plaintiff "saw Dr. Reeves today," and that "[t]he ineffectiveness of [M]DOC health care is appalling. Dr. Reeves[,] for your involvement[,] I'm suing you . . . and others and your medical provider as well." (*Id.*) Plaintiff appealed the NRF 0725 grievance on September 28, 2011. (*Id.* at Pg ID 25.) The Step II grievance names no one specifically, stating only that the "healthcare has been horrible" and that "a lay person can recognize the need for a specialist." (*Id.*) Plaintiff exhausted the NRF 0725 grievance: on January 12, 2012, the Bureau of Health Care Services denied his Step III appeal. (Dkt. 20, MDOC Defs.' Mot. Summ. J. at Pg ID 263.) The denial was mailed to Plaintiff on January 13, 2012. (*Id.*)

Plaintiff also completed the NRF 0726 grievance on September 15, 2011. (Compl. at Pg ID 26.) Plaintiff grieved "healthcare and Dr. Reeves." (*Id.*) He complained that he had only received Tegretol therapy and asserted deliberate indifference to his medical needs. (*Id.*) He also grieved that his cast had been on since April 25, 2011 and that he had been denied access to a specialist.

(*Id.*) On September 28, 2011, Plaintiff appealed to Step II; his appeal stated, in part, "[I] was told by medical staff at RGC that my ankle surg[ery] . . . would be handled here. . . . [T]he situation over [the past four] months has gotten worse. What must be done for relief?" (Compl. at Pg ID 27.) Plaintiff also exhausted this grievance: on January 10, 2012, the Bureau of Health Care Services denied the Step III appeal. (Dtk. 20, Gidley's Mot. Summ. J. at Pg ID 270.) The denial was mailed to Plaintiff on January 12, 2012. (*Id.*)

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material only if it might affect the outcome of the case under the governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). On a motion for summary judgment, the court must view the evidence, and any reasonable inferences drawn from the evidence, in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citations omitted); *Redding v. St. Eward*, 241 F.3d 530, 531 (6th Cir. 2001). The moving party may discharge its initial summary judgment burden by "pointing out to the district court . . . that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the moving party does so, the party opposing the motion "must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita*, 475 U.S. at 587. The Court must determine whether the evidence presents a sufficient factual disagreement to require submission of the challenged claims to a jury, or whether the evidence is so one-sided that the moving party must prevail as a matter of law. *Anderson*, 477 U.S. at 252 ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be

insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.").

## III. ANALYSIS

The Prisoner Litigation Reform Act provides:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a); *see also Jones v. Bock*, 549 U.S. 199, 211 (2007) ("There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court."). The exhaustion prerequisite applies to all inmate suits about prison life, regardless of the nature of the wrong or the type of relief sought. *See Porter v. Nussle*, 534 U.S. 516, 532 (2002); *Booth v. Churner*, 532 U.S. 731, 741 (2001). Moreover, the prisoner must "properly" exhaust his claims by complying with the MDOC grievance policy. *See Woodford v. Ngo*, 548 U.S. 81, 90-91 (2002) ("Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules . . . ."); *Surles v. Andison*, 678 F.3d 452, 455 (6th Cir. 2012) ("A grievant must undertake all steps of the MDOC process for his grievance to be considered fully exhausted. . . . [and] must adhere to any time limitations that are part of the institutional grievance policy." (citing *Jones Bey v. Johnson*, 407 F.3d 801, 803 n. 2 (6th Cir. 2005) *rev'd on other grounds by Jones v. Bock*, 549 U.S. 199 (2007))).

It is not, however, a prisoner's burden to show that he has properly exhausted his administrative remedies. *Jones v. Bock*, 549 U.S. 199, 216 (2007). Rather, non-exhaustion is an affirmative defense, *Jones*, 549 U.S. at 216, and a defendant to a prisoner suit has both the burden of production and persuasion on the issue of non-exhaustion, *Surles*, 678 F.3d at 455-56. As such, a defendant "must show that the record contains evidence satisfying the burden of persuasion and

that the evidence is so powerful that no reasonable jury would be free to disbelieve it." *Surles*, 678 F.3d at 455-56 (internal quotation marks and citation omitted). "Summary judgment is appropriate only if defendants establish the absence of a 'genuine dispute as to any material fact' regarding non-exhaustion." *Id.* (quoting *Risher v. Lappin*, 639 F.3d 236, 240 (6th Cir. 2011)).

To carry their summary judgment burden, the Corizon Defendants, by way of incorporation, offer the affidavit of Richard Russell, the Manger of the Grievance Section of the Michigan Department of Corrections. (Dkt. 77, Corizon Defs.' Mot. Summ. J. at 3.) Russell's affidavit provides (1) that all Step III grievance appeals are recorded in a "Grievance Tracking" database, (2) that, at Russell's direction, this database was searched for Step III grievance appeals filed by Plaintiff, and (3) the search uncovered only two grievances: NRF 0725 and NRF 0726. (Dkt. 20, MDOC Defs.' Summ. J., Ex. B, Russell Aff. ¶¶ 1, 17-18.) Thus, based on the Corizon Defendants' evidence, Plaintiff only exhausted the claims he raised in the NRF 0725 and NRF 0726 grievances.

Turning to Plaintiff's rebuttal, it is notable that Plaintiff does not claim that he has exhausted any other grievances before filing this suit. Instead, he repeatedly points out that he exhausted the NRF 0725 and NRF 0726 grievances and that the RGC 1158 grievance, which MDOC rejected as untimely, should be treated as exhausted because of his transfer to NRF and/or Perea's interference with the appeal of that grievance. (*See* Dkt. 89 at Pg ID 857, 859; Dkt. 93 at Pg ID 971, 972, 975, 979; Dkt. 94 at Pg ID 1002, 1039.)

Beginning with the NRF 0725 and NRF 0726 grievances, there is no dispute that these grievances have been exhausted. But the dispositive question is when. Defendants correctly point out that the PLRA requires that a prisoner exhaust available administrative remedies *before* filing suit. *Freeman v. Francis*, 196 F.3d 641, 645 (6th Cir.1999) ("The plain language of the [PLRA]

makes exhaustion a precondition to filing an action in federal court . . . . The prisoner, therefore, may not exhaust administrative remedies during the pendency of the federal suit."); *see also Oriakhi v. U.S.*, 165 F. App'x 991, 993 (3d Cir. 2006) ("[T]here appears to be unanimous circuit court consensus that a prisoner may not fulfill the PLRA's exhaustion requirement by exhausting administrative remedies after the filing of the complaint in federal court."); *Johnson v. Jones*, 340 F.3d 624, 628 (8th Cir. 2003) ("We also recognize the holdings of many of our sister circuits that permitting exhaustion pendente lite undermines the objectives of section 1997e(a) and that the language of section 1997e(a) clearly contemplates exhaustion prior to the commencement of the action as an indispensable requirement, thus requiring an outright dismissal of such actions rather than issuing continuances so that exhaustion may occur."); *Ross v. Duby*, No. 09-531, 2010 WL 3732234, at *1 (W.D. Mich. Sept. 17, 2010) ("Now that the MDOC has responded to Plaintiff's Step III grievance, Plaintiff's administrative remedies have been exhausted. Regardless, the Court must dismiss Plaintiff's claim, as Plaintiff cannot perfect the exhaustion requirement during the pendency of his case."). As noted, the Bureau of Health Care Services denied Plaintiff's Step III appeals of the NRF 0725 and NRF 0726 grievances in mid-January 2012. (Dkt. 20, MDOC Defs.' Mot. Summ. J. at Pg ID 263, 270.) The Corizon Defendants argue that, under the prison mailbox rule, Plaintiff filed this suit on December 22, 2011. (Dkt. 77, Corizon Defs.' Mot. Summ. J. at 11.) Accordingly, say Defendants, he did not exhaust either grievance before filing this lawsuit. (*Id.*)

On its face, Defendants' argument is sound. Under the prison mailbox rule, "a pro se prisoner's complaint is deemed filed when it is handed over to prison officials for mailing to the court." *Brand v. Motley*, 526 F.3d 921, 925 (6th Cir. 2008). "Cases expand the understanding of this handing-over rule with an assumption that, absent contrary evidence, a prisoner does so on the

date he or she signed the complaint." *Id.*; *see also Scott v. Evans*, 116 F. App'x 699, 701 (6th Cir. 2004) ("[T]he complaint of a pro se petitioner who applies for permission to proceed IFP is deemed 'filed' for statute of limitations purposes when the petitioner deposits both the complaint and the application to proceed IFP in the prison mail system to be forwarded to the court clerk."). In this case, Plaintiff signed his Complaint on December 22, 2011. (Compl. at Pg ID 4.) Plaintiff also signed his in forma pauperis application on that date. (Dkt. 2 at Pg ID 13.) Moreover, as the Corizon Defendants point out, Plaintiff has not asserted that his filing date is anything other than December 22, 2011 — even after being informed that this was the basis for Defendants' exhaustion argument. (*See* Dkt. 96, Corizon Defs.' Reply to Pl.'s Resp. to Mot. Summ. J. at 3.) Accordingly, Plaintiff appears to have "filed" this suit prior to exhausting his administrative remedies.

The Court recognizes that the rationales behind the prison mailbox rule do not typically result in it being applied against a prisoner. Rather, the prison mailbox rule generally aids a prisoner in timely filing: courts apply the rule to grant a prisoner an earlier filing date in the face of a defendant's reliance on the statute of limitations or other filing deadline. Indeed, the Sixth Circuit summarized the Supreme Court's justification for the prison mailbox rule as follows:

> In *Houston v. Lack*, 487 U.S. 266, 270, 108 S.Ct. 2379, 101 L.Ed.2d 245 (1988), the United States Supreme Court held that a pro se petitioner's notice of appeal on habeas corpus review is deemed filed on the date that it is turned over to prison officials for transmittal to the court. Based upon an interpretation of the language of Federal Rules of Appellate Procedure 4(a)(1) and 3(a), which provide that an appeal is commenced with the filing of a notice of appeal with the district clerk, the Supreme Court held that the language of the rules was sufficient to allow accommodation for the unique circumstances of an incarcerated pro se petitioner. *Id.* at 270-272, 108 S.Ct. 2379. In reaching this holding, the Court identified several concerns particular to the incarcerated petitioner without counsel: 1) the petitioner's inability to control the notice of appeal after it has been delivered to prison officials, 2) the petitioner's lack of legal counsel

> to institute and monitor the process, and 3) any incentive on the part of prison authorities to delay a pro se prisoner's filing beyond an applicable time limit. *Id.*

*Richard v. Ray*, 290 F.3d 810, 812-13 (6th Cir. 2002). In the context of exhaustion, these three rationales do not apply with much force.

Another, however, does. "Because exhaustion requirements are designed to deal with parties who do not want to exhaust, administrative law creates an incentive for these parties to do what they would otherwise prefer not to do, namely, *to give the agency a fair and full opportunity to adjudicate their claims*." *Woodford v. Ngo*, 548 U.S. 81, 90-91 (2006) (emphasis added); *see also id.* at 89 ("Exhaustion gives an agency an opportunity to correct its own mistakes with respect to the programs it administers before it is haled into federal court, and it discourages disregard of [the agency's] procedures." (internal quotation marks and citation omitted)).

In this case, Plaintiff did not give MDOC a "full opportunity" to resolve the complaints raised in the NRF 0725 and NRF 0726 grievances. On December 22, 2011, more than two weeks before the Bureau of Health Care Services responded to his Step III appeals, Plaintiff had done all that he could to file this lawsuit. He had drafted his Complaint. He had executed it. He had completed his in forma pauperis application. And he had executed that. On December 29, 2011, the MDOC prepared an accounting and certification in support of Plaintiff's in forma application. (Dkt. 2 at Pg ID 66-76.) Yet, at the time these events occurred, Plaintiff could not have known whether the Bureau believed that the NRF 0725 and NRF 0726 grievances had merit. *See Perez v. Wisconsin Dept. of Corr.*, 182 F.3d 532, 536 (7th Cir. 1999) ("No one can *know* whether administrative requests will be futile; the only way to find out is to try. . . . What's the harm in waiting to see how the administrative process turns out?"). Indeed, even by the time Plaintiff's suit

was docketed with this Court on January 10, 2012, MDOC had not yet mailed Plaintiff his Step III denials. Although Plaintiff perhaps believed it to be unlikely, the Bureau may then have been in the process of granting Plaintiff his desired relief. If so, this lawsuit, at least to the extent it is based on the NRF 0725 and NRF 0726 grievances, would have been unnecessary. And that is precisely the point of exhaustion. Accordingly, the Court agrees with the Corizon Defendants that the prison mailbox rule applies in this case, and therefore concludes that Plaintiff did not exhaust the NRF 0725 or NRF 0726 grievance before he filed this lawsuit.

That leaves the RFC 1158 grievance. The grievance coordinator at RGC rejected this grievance as untimely at Step II. MDOC Policy Directive 03.02.130 allows for the rejection — as opposed to a denial — of grievances that are "filed in an untimely manner." (Dkt. 20, MDOC Defs.' Mot. Summ. J., Ex. A, MDOC Policy Directive 03.02.130 ¶ G4.) And even "Step II grievance[s]" may be rejected. (*Id.* ¶ CC.) Plaintiff, however, correctly points out that the Policy Directive also provides, "The grievance shall not be rejected if there is a valid reason for the delay; e.g., transfer." (*Id.*) Plaintiff asserts that his transfer from RGC to NRF delayed his Step II appeal of the RGC 1158 grievance, and, further, Perea, the grievance coordinator at NRF, "thwarted" his attempt to obtain the Step II form. (*See* Dkt. 93 at Pg ID 971, 972, 975, 979.) In summarizing this argument in a prior report and recommendation, this Court, citing *Surles v. Andison*, 678 F.3d 452 (6th Cir. 2012), noted that "Plaintiff's unrebutted allegations that Perea's conduct or Plaintiff's transfer from RGC to NRF excuses his failure to timely exhaust" could warrant a finding that a genuine issue of material fact existed as to Plaintiff's exhaustion of the RGC 1158 grievance. *Coleman R & R*, 2012 WL 5986779, at *9. The Court, however, was explicit that it was not then deciding the issue. *Id.*; *see also Coleman Op. & Order*, 2012 WL 5986679, at *1.

The Court will do so now. When accepting the following allegations as fact, Plaintiff is arguably correct that the RGC 1158 grievance should not have been rejected as untimely because he had "a valid reason for the delay." (*See* Dkt. 20, Ex. A, MDOC Policy Directive 03.02.130 ¶ G4.) On August 20, 2011, two days after his transfer from RGC to NRF, Plaintiff requested a Step II grievance form for the RGC 1158 grievance from Perea, the grievance coordinator at his new facility. (Dkt. 33, Pl.'s Resp. to Perea's Mot. Summ. J. at Pg ID 330; Dkt. 35, Pl.'s Resp. to Smith's Mot. Summ. J. at Pg ID 354.) Perea responded that Plaintiff needed to request the form from the grievance coordinator at RGC. (*Id.*) (In fact, a Step I grievance receipt dated August 8, 2011 informed Plaintiff that if he had not received a Step I response by August 29, 2011, he could request an appeal form from "this office," quite clearly referring to the RGC grievance coordinator's office. (Dkt. 93 at Pg ID 991.)) Plaintiff made this request on August 24, 2011 — prior to the September 7, 2011 deadline for appealing the RGC 1158 grievance to Step II — but apparently did not receive the form from RGC until September 13, 2011. (Dkt. 33, Pl.'s Resp. to Perea's Mot. Summ. J. at Pg ID 330; Dkt. 35, Pl.'s Resp. to Smith's Mot. Summ. J. at Pg ID 355.) Thus, accepting Plaintiff's allegations as true, the RGC grievance coordinator was arguably wrong to reject Plaintiff's Step II appeal as untimely. (*Compare* Pl.'s Resp. to Smith's Mot. Summ. J. at Pg ID 355 *with* MDOC Policy Directive 03.02.130 ¶ G4.) Plaintiff's transfer was conceivably a valid reason for the delay in appealing that grievance.

But it does not follow that Plaintiff's failure to exhaust the RGC 1158 should be excused or that this Court should otherwise deem that grievance exhausted. The Corizon Defendants aptly point out that the very policy directive Plaintiff relies on also provides, "A grievant whose grievance is rejected may appeal the rejection to the next step as set forth in this policy. A new grievance shall

not be filed regarding the rejection." (Dkt. 20, Ex. A, MDOC Policy Directive 03.02.130 ¶ I.) Thus, MDOC's grievance procedure contemplates that a grievance coordinator, such as the RGC grievance coordinator, might wrongly reject a grievance. It thus gives an avenue of recourse to a prisoner who believes that this occurred: appeal to the next step of the grievance process and assert that the grievance was improperly rejected at the prior step.

Given the foregoing, the Corizon Defendants have carried their summary judgment burden in demonstrating that Plaintiff did not exhaust the RGC 1158 grievance. First, they have put forth evidence showing that Plaintiff did not appeal the rejection of the RGC 1158 grievance through Step III. Second, they have shown that this option, as stated in a governing MDOC policy directive, was "available" to Plaintiff. *See* 42 U.S.C. § 1997e(a) ("No action shall be brought with respect to prison conditions under . . . Federal law[] by a prisoner . . . until such administrative remedies *as are available* are exhausted" (emphasis added)); *Napier v. Laurel Cnty., Ky.*, 636 F.3d 218, 224 (6th Cir. 2011) ("Faced with a policy that was not clearly unavailable, the only way to determine if the process was available, or futile, was to try." (internal quotation marks and citation omitted)); *cf. Peterson v. Cooper*, 463 F. App'x 528, 530 (6th Cir. 2012) ("The steps proposed by the defendants—that Peterson should have requested the form from another source or filed his appeal without the required form—are not found in, and in fact conflict with, the prison's grievance procedure."). Faced with Defendants' evidence and argument, Plaintiff has not provided any rebuttal evidence showing that anyone prevented him from appealing the Step II rejection to Step III. He has not even alleged or evidenced that he attempted to appeal the rejected Step II grievance as contemplated by MDOC Policy Directive 03.02.130 ¶ I. This case is therefore distinguishable from *Surles*. *Cf. Surles*, 678 F.3d at 457 ("In his opposition to the motion for summary judgment, Surles

explained that when he 'attempted to file a grievance to expose Defendants [sic] action of corruption etc., agent Christine Hemry refuse[d] to file or process these grievances.' Moreover, at the Step III stage of some of Surles's re-filed grievances, he alleged that Defendants denied him access to the courts as well as the ability to exhaust his administrative remedies."). Accordingly, the Court concludes that Defendants have carried their summary judgment burden of demonstrating that the RGC 1158 grievance is unexhausted.

## IV. CONCLUSION AND RECOMMENDATION

For reasons set forth above, this Court RECOMMENDS that Defendants Corizon Health, Inc., Lisa Reeves, Rickey Coleman, Ramesh Kilaru, Foster Morris, and Gina Couturier's Motion to Dismiss or, in the alternative, for Summary Judgment (Dkt. 77) be GRANTED. In particular, Defendants Corizon Health, Inc., Reeves, Coleman, Kilaru, Morris, and Couturier should be DISMISSED WITHOUT PREJUDICE because Plaintiff failed to administratively exhaust his claims against them before filing this lawsuit.

## V. FILING OBJECTIONS TO THIS REPORT

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830 (6th Cir. 2006) (internal quotation marks omitted); *Frontier*, 454 F.3d at 596-97. Objections are to be filed through the Case

Management/Electronic Case Filing (CM/ECF) system or, if an appropriate exception applies, through the Clerk's Office. *See* E.D. Mich. LR 5.1. A copy of any objections is to be served upon this magistrate judge but this does not constitute filing. *See* E.D. Mich. LR 72.1(d)(2). Once an objection is filed, a response is due within fourteen (14) days of service, and a reply brief may be filed within seven (7) days of service of the response. E.D. Mich. LR 72.1(d)(3), (4).

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES MAGISTRATE JUDGE

Dated: February 15, 2013

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing document was served on the attorneys and/or parties of record by electronic means or U.S. Mail on February 15, 2013.

s/Jane Johnson
Deputy Clerk